2014-1652
(Serial No. 12/429,724)

**IN THE**

# United States Court of Appeals
### FOR THE FEDERAL CIRCUIT

# In re:  Webb

*Appeal from the United States Patent and Trademark Office*
*Patent Trial and Appeal Board.*

# Brief for Appellant
## Derek J. Webb

———————————————

Robert A. Rowan
rar@nixonvan.com
Alan M. Kagen
amk@nixonvan.com
Michael E. Crawford
mec@nixonvan.com
NIXON & VANDERHYE P.C.
901 North Glebe Road
Arlington, Virginia 22203
703-816-4000

Attorneys for Appellant
Derek J. Webb

# Certificate of interest

Counsel for Appellant certifies the following:

1.    The full name of every party represented by me is Derek J. Webb and whose home address is: 7251 West Lake Mead Boulevard, Suite 300, Las Vegas, NV 89128.

2.    The names of the real party in interest represented by me is: Derek J. Webb.

3.    All parent corporations or any publicly held companies that own 10 percent or more of the stock of the parties or amicus curiae represented by me are: None

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

> Robert A. Rowan
> rar@nixonvan.com
> Alan M. Kagen
> amk@nixonvan.com
> Michael E. Crawford
> mec@nixonvan.com
> NIXON & VANDERHYE P.C.
> 901 North Glebe Road
> Arlington, VA 22203-1808
> Phone: 703-816-4000
> Fax: 703-816-4100

September 22, 2014          */s/ Robert A. Rowan*
                                 Robert A. Rowan
                                 rar@nixonvan.com
                                 NIXON & VANDERHYE P.C.

                                 *Counsel for Appellant*

# Table of contents

**Page**

Certificate of interest.................................................................................i

Table of contents.....................................................................................ii

Table of authorities ...............................................................................iii

Statement of related cases .......................................................................v

Statement of jurisdiction ........................................................................1

I.      Statement of the issues..................................................................1

II.     Statement of the case ...................................................................1

        A.      Overview, background and claims of the invention ..............1

        B.      Full text of all independent claims .......................................9

III.    Grounds of rejection to be reviewed on appeal ...............................12

IV.     Summary of argument ...................................................................12

V.      Argument ......................................................................................15

        A.      Standard of review...............................................................15

        B.      The Board erred in holding claims 1-15 patent-ineligible ......15

VI.     Conclusion and statement of relief sought .......................................34

Addendum:   Decision on appeal of the U.S. Patent Trial and Appeal Board, April 1, 2014

Certificate of service

Certificate of compliance

# Table of authorities

**Cases**                                                    **Page**

*Alice Corporation Pty, Ltd. v. CLS Bank International,*
134 S.Ct. 2347 (2014) ........................................................ 13, 15, 16, 18-24, 32, 34

*Bilski v. Kappos*, 561 U.S. 593, 130 S.Ct. 3218 (2010) ............ 15-17, 26, 27, 32, 34

*Brenner v Manson,* 383 U.S. 519 (1966) ..................................................................34

*Diamond v. Chakrabarty*, 447 U.S. 303 (1980) ..........................................17, 18, 26

*Diamond v. Diehr,* 450 U.S. 175 (1981) ................................................13, 16, 19, 25

*Ex parte Futrell*, Appeal No. 2012-000740,
2014 WL 3950414 (PTAB Aug. 11, 2014) ...................................................... 25-26

*Ex parte Griffith*, App. No. 2011-013727,
2013 WL 5956217 (PTAB Nov.7, 2013) ......................................................... 26-27

*Ex parte Hamer*, App. No. 2011-013191,
2013 WL 6217820 (PTAB Nov. 18, 2013) ....................................................... 27-29

*Ex parte Loewenstein*, App. No. 2011-013688,
2014 WL 1154021 (PTAB March 20, 2014) ..................................................... 29-32

*Gottschalk v Benson*, 409 U.S. 63, 67 (1972) .............................................17, 18, 23

*In re Elsner*, 381 F.3d 1125 (Fed.Cir. 2004) ..........................................................15

*In re Fisher*, 421 F.3d 1365 (Fed.Cir. 2005) ...............................................15, 18, 33

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.,*
132 S.Ct. 1289 (2012) .....................................................................................16, 20

*Molecular Pathology v. Myriad Genetics, Inc.*, 133 S.Ct. 2107 (2013)..................16

*Parker v. Flook*, 437 U.S. 584 (1978) ....................................................25

*Planet Bingo, LLC v. VKGS LLC*,
No. 2013-1663, 2014 WL 4195188 (Fed.Cir Aug. 26, 2014) .................................32

*Research Corporation Technologies v. Microsoft Corporation*,
627 F.3d. 859 (Fed.Cir. 2010).................................................................15

*Ultramercial v. Hulu*, 657 F.3d 1323 (Fed.Cir. 2011).................................25, 33, 34

**Statutes**

35 U.S.C. §101 ..............................................................................14, 33, 34

35 U.S.C. § 102 ....................................................................................14, 15

35 U.S.C. § 103 ....................................................................................14, 15

35 U.S.C. § 112 ....................................................................................14, 15

**Other Authorities**

"Interim Guidance for Determining Subject Matter Eligibility
for Process Claims in View of *Bilski v. Kappos*, 75 Fed. Reg.
43,922, 43,925-26 (July 27, 2010)..............................................................3

Memorandum from USPTO Deputy Commissioner for Patent
Examination Policy, Andrew H. Hirshfeld, to patent examining
corps: "Preliminary Examination Instructions in view of the Supreme
Court decision in *Alice Corporation Party. Ltd. v CLS Bank
International, et al*" (6/25/2014)...........................................13-14, 22-24

Manual of Patent Examining Procedure §2106 .................................................23, 32

Manual of Patent Examining Procedure §2107 .....................................................33

Webster's Third New International Dictionary
of the English Language (Unabridged) (2002)..................................................18, 19

## Statement of Related Cases

No other appeal in or from the same proceeding was previously before this Court or any other appellate court, whether under the same or a similar title, and there are no related cases pending before this Court or any other court.

# Statement of Jurisdiction

A.     The statutory basis for jurisdiction of the U.S. Patent and Trademark Office Patent Trial and Appeal Board ("Board") is 35 U.S.C. §§ 6 and 134.

B.     The statutory basis for jurisdiction of this Court is 35 U.S.C. §§ 141 and 142.

C.     Appellant filed a timely Notice of Appeal on May 29, 2014 from the Board's final and appealable Decision on Appeal issued April 1, 2014 ("Decision").  A002 to A012.

# I.     Statement of the issues

1. Did the Decision (A002 to A012) improperly conclude that claims 1-15 of Appellant's patent application were directed to patent-ineligible subject matter under 35 U.S.C. § 101?

# II.     Statement of the case

## A.     Overview, background and claims of the invention

Appellant filed the present patent application (the "Webb application") on April 24, 2009.  A042.  This application is a continuation of Application No. 11/227,106 filed September 16, 2005.  A042.  During prosecution, all claims (1-15) were rejected by the examiner under 35 U.S.C. § 101 as being

directed to patent-ineligible subject matter.  A083-86.  All claims were further rejected under 35 U.S.C. § 103(a) as obvious in view of certain combinations of prior art.  A086-88.  All rejections were appealed to the Board on January 31, 2011.  A093-97.  By Decision On Appeal dated April 1, 2014, the Board reversed each of the Examiner's § 103(a) rejections, but affirmed the Examiner's decision rejecting claims 1-15 under 35 U.S.C. § 101.  A00212.  Appellant filed a timely Notice of Appeal on May 29, 2014 directed to the Board's § 101 Decision. A190-92.

The Board selected claim 7 as representative of claims 1-15 in deciding the Appeal.  Claim 7 provides:

A method of playing a player(s) versus player(s) card game with a plurality of players, the method comprising dealing hands of cards to the players one card at a time using at least one device or using a table; conducting multiple rounds of wagering among the players in a first direction; conducting a last round of wagering among the players in a second direction opposite from the first direction; and resolving the card game and wagers only after completing all rounds of wagering, wherein the first direction is pre-established prior to conducting the initial round of wagering.[1]

---

[1]  The full text of each independent claim is set out on pages 9-12 *infra*.

The Examiner determined that claim 7 is not directed to patent-eligible subject matter under 35 U.S.C. § 101, because it "requires no machine implementation, requires no transformation of a particular article and is seen as an attempt to receive patent protection for an abstract idea in the form of a new set of rules." Ans. 8, A004, citing Answer 8. The Board observed that the "Examiner analyzed several factors weighing toward or against patent eligibility and determined that the factors in this case weighing against patent eligibility far outweigh the factors weighing toward patent eligibility," A004, citing Ans. 9 (citing Interim Guidance for Determining Subject Matter Eligibility for Process Claims in View of Bilski v. Kappos, 75 Fed. Reg. 43,922, 43,925-26 (July 27, 2010)).

The invention claimed by the Webb application encompasses poker games, particularly those utilizing "community cards" (cards utilizable by all players), where the betting order or direction varies during wagering rounds within one hand of play. For example, a first wagering round may proceed in the conventional manner and a second or subsequent wagering round may start with a different player and/or proceed in an opposite direction (counter-clockwise or "anti-clockwise") among the players. The varied wagering order can be changed for each betting round or follow a preset pattern. In this manner, the "button player," who always bets last when wagering is conducted in the conventional manner, does

not have the advantage during the entire hand.  This advantage is significant during conventional play as the button player in the conventional game has the ability to use wager action to influence the game.  That is, in each wagering round in the conventional game, the button player is afforded the opportunity to see every other player's wager action prior to acting.  The button player can thus gain a sense about each player's hand before deciding what action to take (wager, call, raise or fold).  Eliminating or reducing this advantage by the method of the present invention distributes the wagering advantage during the game, resulting in a game play that is more fair than the conventional methodology.  See specification, ¶0019 (A0019-20).

FIG. 1 of the patent is an exemplary illustration of a game play scenario for a Texas Hold 'Em poker game.  A027.  The table 10 is shown with five player areas 12 for players (a)-(e).  In a typical Hold 'Em poker game, a button player is first established among the plurality of players.  A button marker 18 may be provided on the table to indicate which player is the button player.  In the exemplary illustration in FIG. 1, the button player is player (e).  When dealing cards, the dealer deals the first card to the player sitting next to the button player in a clockwise direction around the table (player (a)).  In Texas Hold 'Em, each player receives a first card beginning with the player sitting in next clockwise sequence of the button player (player (a)), and then each player receives a second

card in order.  A wagering round is then conducted beginning with the first player sitting next to the button player in the clockwise direction who is still in the game. If the game is being played as a "two-blind" game, the player sitting in next clockwise sequence of the button player (player (a)) is the "small blind" and wagers a first amount, and the player in next clockwise sequence of the small blind (player (b)) is the "big blind" and wagers a second amount, typically twice the first amount.  These wagers are considered part of the first wagering round, so the first player to wager after the cards are dealt would be the player in clockwise sequence of the big blind (player (c)).  See specification, ¶0016, (A018-19).

After the first round of wagering is concluded, the dealer deals a first set of three community cards 20, called the "flop."  A second round of wagering is conducted typically beginning with the first player in clockwise sequence of the button player who is still in the game and proceeding clockwise around the table. When the second round of wagering is completed, the dealer deals another community card 22, called the "turn."  After yet another round of wagering, also beginning with the first player sitting next to the button player in the clockwise direction who is still in the game, the dealer deals a fifth community card 24, called the "river."  A final wagering round is then conducted again beginning with the first player sitting next to the button player in the clockwise direction who is still in the game.  Specification, ¶0005 (A016).

5

After the wagering rounds are completed, player hands for players still in the game are compared, and the best player hand wins the pot. After the played hand is complete, the button 18 typically passes to the next player at the table in the clockwise direction (player (a) in FIG. 1), and play begins again. See the solid arrow in FIG. 1. Specification, ¶0009 (A017)

With the conventional methodology, the button player or last acting player has a positional advantage over the other players in each betting round throughout the entire hand (provided such player stays in the game) because the button player or last acting player is afforded the opportunity to see each player's wager action prior to making a wager and can assess each other player's actions and mannerisms before deciding whether to wager or fold, etc. The last acting player can thus gain a sense about each player's hand before deciding what action to take (wager, call, raise or fold). The method of the present invention distributes this positional advantage during the game, resulting in a game methodology that is more fair than the conventional methodology. Specification (A017-18).

In order to more fairly distribute the positional advantage, the method according to the present invention varies the wagering order or direction. The direction around the table for player wagers may be reversed on a round-by-round

basis or for first and last wagering rounds, second and third wagering rounds or any other combination.  See the dashed arrow in FIG. 1.  A027.

In one embodiment, the beginning wagers on each round alternate between the first player still in the game sitting in clockwise sequence of the button player ("the starting player") and either the button player or the first player still in the game sitting in anti-clockwise sequence of the button player if the button player is no longer in the game ("the last acting player").  In these alternating rounds, the wagering direction may follow clockwise, anti-clockwise, clockwise, anti-clockwise or vice versa beginning with anti-clockwise.  Alternatively, with a card game including four rounds of wagering, the wagering rounds may be conducted with the initial round of wagering beginning with the starting player with subsequent rounds of wagering beginning with the last acting player in the opposite direction, and with the last subsequent round of wagering beginning with the starting player.  In this context, the wagering direction may follow clockwise, anti-clockwise, anti-clockwise, clockwise, or the opposite as anti-clockwise, clockwise, clockwise, anti-clockwise.  Still further, the wagering rounds may follow clockwise, clockwise, anti-clockwise, anti-clockwise, or the opposite as anti-clockwise, anti-clockwise, clockwise, clockwise.  Specification, ¶0021.  A020.

In a "two blind" game, prior to any cards being dealt, the player sitting next to the button player in clockwise sequence (player (a) in FIG. 1) makes an initial wager for the first round of wagering as the "small blind" and the player sitting in clockwise sequence next to the small blind (player (b) in FIG. 1, A027) makes an initial wager as the "big blind". After the first cards are dealt to the players, the next wager decision is made (call, raise or fold) by the player sitting next to the big blind in the clockwise direction (player (c) in FIG. 1). In describing this concept, it is assumed that the blinds form part of the first round of wagering. When there are two players only, if the first player has the big blind then the button is first to act on the first round only. Other possibilities for games utilizing four wagering rounds are described in the specification at ¶0023. A021. In these scenarios, it is assumed that a clockwise wagering round begins with the starting player (as defined above - even if the beginning wager for the first round is a blind) and that an anti-clockwise wagering round beings with the last acting player (as defined above). Specification, ¶0023. A021.

The methodology is also applicable in games with three rounds of wagering. Specification, ¶0024. A0021-22.

To ensure that all players understand the wagering order, the button marker 18 may be marked with the wagering directions as shown in FIG. 2, A028. With

the single arrow marker, prior to each wagering round, the dealer can orient the button marker 18 so that the arrow points in the direction of wagering around the table.  Alternatively, each button marker may be provided with multiple arrows to indicate wagering directions for each phase of a hand.  The table may alternatively include markings or lights or the like designating the button player and wagering direction.  Specification, ¶0025.  A022.

**Full text of all independent claims**

1.  A method of playing a player(s) versus player(s) card game comprising:

(a)  using at least one device or using a table, initiating a hand with an even number of rounds of wagering by establishing a button player among a plurality of players, the hand being resolved only after completing the rounds of wagering [A023];

(b)  dealing cards beginning with a starting player positioned relative to the button player, the starting player being a player still in the hand sitting in next clockwise sequence of the button player [A023];

(c)  conducting the even number of rounds of wagering wherein one half of the rounds are conducted in one direction and another half of the rounds are

conducted in an opposite direction, the wagering directions for each round and the button player being pre-established prior to step (b) [A023]; and

(d)  completing the hand according to game rules [A023].

7.  A method of playing a player(s) versus player(s) card game with a plurality of players, the method comprising dealing hands of cards to the players one card at a time using at least one device or using a table [A023]; conducting multiple rounds of wagering among the players in a first direction [p. 5, lines 4-21; p. 7, line 17]; conducting a last round of wagering among the players in a second direction opposite from the first direction [A023]; and resolving the card game and wagers only after completing all rounds of wagering, wherein the first direction is pre-established prior to conducting the initial round of wagering [A023].

13.  A method of playing a player(s) versus player(s) card game comprising:

(a)  using at least one device or using a table, initiating a hand with three or five rounds of wagering by establishing a button player among a plurality of players, the hand being resolved only after completing the rounds of wagering [A024];

(b)  dealing cards beginning with a starting player positioned relative to the button player, the starting player being a player still in the hand sitting in next clockwise sequence of the button player [A024];

(c)  conducting the three or five rounds of wagering respectively in different directions, including clockwise (CW) and anti-clockwise (ACW), wherein the rounds are conducted as one of:

CW-ACW-CW

ACW-CW-ACW

CW-CW-ACW

ACW-ACW-CW

CW-ACW-CW

ACW-CW-CW

CW-ACW-CW-ACW-CW

ACW-CW-ACW-CW-ACW

the wagering directions for each round and the button player being pre-established prior to step (b) [A024];

(d)  dealing at least one community card between the rounds of wagering [A024]; and

(e)  completing the hand according to game rules [A024].

14.  A method of playing a player(s) versus player(s) card game with a plurality of players, the method comprising dealing hands of cards to the players using at least one device or using a table [A024-25]; conducting an initial round of wagering among the players in a first direction [A025]; conducting subsequent rounds of wagering among the players, at least a last of the subsequent rounds of wagering among the players being conducted in a second direction opposite from the first direction [A025]; and resolving the card game and wagers only after completing all rounds of wagering, wherein the first direction is pre-established prior to conducting the initial round of wagering, and wherein knowledge of the pre-established betting directions has an impact on player decisions [A025].

## III.  Grounds of rejection to be reviewed on appeal

Whether claims 1-15 are patent ineligible under 35 U.S.C. §101.

## IV.  Summary of the argument

The patent claims presented by this appeal do not involve any natural phenomena or laws of nature, nor do they seek to patent or "monopolize" any

abstract ideas.  The patent claims at issue address a very specific method of playing a player v. player card game that requires dealing hands of cards, one card at a time, using at least one device or using a table, conducting multiple rounds of wagering, including a last round in a direction opposite that of previous rounds, then resolving the game and wagers.

Appellant readily acknowledges that there is an abstract idea underlying Appellant's invention, the recognition that later actors, who have the opportunity to observe and be guided by the actions of earlier actors, have an advantage over the earlier actors.  However, the patent claims at issue do not seek to patent or monopolize that concept – they seek to apply it in a specific fashion and in a specific context in which that idea has never before been applied – as acknowledged by the Decision below, reversing all prior obviousness rejections.

The Supreme Court has long recognized that applications of abstract ideas are patent-eligible.  See, *e.g.*, *Diamond v. Diehr*, 450 U.S. 175, 182 (1981) and *Gottshalk v. Benson*, 409 U.S. 63, 67 (1972) ("[A]pplication[s] of such concepts to a new and useful end . . . remain eligible for patent protection."), cited with approval in *Alice Corporation Pty, Ltd. v. CLS Bank International*, 134 S.Ct. 2347, 2354 (2014).

This fundamental principle has been further recognized by the Commissioner of Patents in the recently issued memo to the USPTO's Patent

Examining Corps entitled "Preliminary Examination Instructions in view of the Supreme Court Decision in *Alice Corporation Pty. Ltd. v. CLD Bank International*, *et al*." ("[I]nventions that integrate the building blocks of human ingenuity into something more by applying the abstract idea in a meaningful way are eligible").

The PTO Board has also applied this principle to various types of game inventions that involve minimal apparatus (no more than the cards, players, table or other "device" required to implement Appellant's invention) and actions (such as sucking or blowing through a straw) that are much, much less sophisticated than the reversals of the wagering order incorporated into Appellant's claims.

It is respectfully submitted that application of the guiding principles enunciated by the Supreme Court over many decades of Section 101 jurisprudence, as further explicated by the reasoning of the PTO Commissioner's Post-*Alice* Instructions and the illustrative claims approved by the PTO Board in factually analogous game contexts all lead to the conclusion that the claims presented by this appeal are patent eligible and that having passed muster under Sections 102, 103 and 112, ought to result in an issued patent.

## V.    Argument

### A.    Standard of review

The Board's legal conclusions are reviewed *de novo*.  *In re Elsner*, 381 F.3d 1125, 1127 (Fed. Cir. 2004).

### B.    The Board erred in holding claims 1-15 patent-ineligible

Each of the claims of the Webb Application have been found to meet all of the requirements of 35 U.S.C. §§ 102, 103 and 112, which both the Supreme Court and this court have held should be the focus of "primary attention" for patentability.   See *Bilski v. Kappos*, 561 U.S. 593, 130 S.Ct. 3218, 3226 (2010); *In Re Fisher*, 421 F.3d 1365, 1378 (Fed. Cir. 2005); and *Research Corporation Technologies v. Microsoft Corporation*, 627 F.3d. 859, 868 (Fed. Cir. 2010). Appellant's claims have nonetheless been rejected by the PTO Examiner and the Board because Appellant's claims (claim 7 was selected by the Board as representative of all claims) "requires no machine implementation, requires no transformation of a particular article and [are] seen as an attempt to receive patent protection for an abstract idea in the form of a new set of rules."  Examiner's Answer, at p. 8, A143, Decision at p. 3, A004.

Shortly after to the Board's Decision, the Supreme Court, on June 19, 2014, decided *Alice Corporation Pty, Ltd. v. CLS Bank International*, S.Ct. 2347 (2014), ("*Alice*") further explicating its *Bilski* decision and the Court's subsequent

15

decisions in *Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 133, S.Ct. 2107 (2013) ("*Myriad*"), and *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S.Ct. 1289 (2012) ("*Prometheus*"), each of which addresses the Supreme Court's three non-statutory, judicially-created exceptions to § 101 patentability:  "laws of nature, natural phenomena, and abstract ideas."  See *Alice*, 134 S.Ct. 2347, 2350 (2014), quoting from *Myriad*, 133 S.Ct. at 211.

"[L]aws of nature" and "natural phenomena" are not involved in this case. Nor, Appellant submits, are the method steps of Appellants' claims barred by the judicial exception to patentability for "abstract ideas."  None of the method steps of the Webb application, for example, dealing cards and conducting rounds of wagering, are mental steps; they are essentially physical steps (as acknowledged by the Examiner (see Final Rejection, at A085), even though they can be accomplished either manually or in an electronic medium,[2] and are thus distinguishable from mere abstract ideas as contemplated by Supreme Court's precedent, particularly *Bilski*, *Diamond v. Diehr,* 450 U.S. 175, 182 (1981) ("*Diehr*") and *Alice*, and by the "ordinary, contemporary, common meaning" of "abstract" idea.

_____

[2]  Appellant's specification provides that the invention "can be embodied in a wide variety of forms and media including, but not limited to, single player slot video machines, multi-player slot video machines, electronic games and devices…. In addition, the described embodiments can also be readily implemented as a computer program product … to implement the features of the invention." Specification, ¶0026, A022.

Aside from invoking a quote from *Gottschalk v Benson,* 409 U.S. 63, 67 (1972), that "[a] principle, in the abstract, is a fundamental truth; an original cause; a motive," the Supreme Court in *Bilski* did not provide a definition of abstractness. Instead, it invited the Federal Circuit to develop "other limiting criteria that further the purposes of the Patent Act and are not inconsistent with its text." *Bilski*, 130 S.Ct. at 3231. This court attempted to follow that directive in multiple post-*Bilski* cases but, at least in the *Myriad, Prometheus* and *Alice* cases, the Supreme Court was not satisfied with those attempts.

However, the *Bilski* Court also made the more prosaic point that words (such as the statutory categories of patentable subject matter, e.g., "process") should be given their "ordinary, contemporary, common meaning," pointing to Webster's New International Dictionary (2d ed. 1954) to define "method" as "[a]n orderly procedure or process …regular way or manner of doing <u>anything</u>." 130 S.Ct. at 3228 (emphasis added), citing *Diehr*, 450 U.S. at 182[3].

In *Bilski,* 130 S.Ct. at 3221, the Supreme Court observed that courts "should not read into the patent laws limitations and conditions which the legislature has not expressed"…and that "in choosing such expansive terms [such as method or process]… Congress plainly contemplated that the patent laws would be given

---

[3] The Supreme Court also used dictionary definitions to define §101's "manufacture" and "composition of matter" in *Diamond v. Chakrabarty,* 447 U.S., 303, 308 (1980) ("*Chakrabarty*").

wide scope." *Id.,* at 3237, n.3, citing *Diamond v. Chakrabarty,* 447 U.S. 303, 308 (1980). [4]

The "ordinary, contemporary, common meaning[s]" of "abstract," as defined by Webster's, are: "dealing or tending to deal with a subject in the abstract: as…of a science: PURE, THEORETICAL, as opposed to *applied;*" "**In the abstract**: with reference to theoretical conditions only: apart from practical or actual conditions;" "to separate (as an idea) by the operation of the mind: consider (as a quality or attribute) apart from the application to a particular object or instance*."* Webster's Third New International Dictionary of the English Language (Unabridged) (2002), capitals, bolding and italics the authors'.

The subject matter of the present invention is not "abstract" within the Supreme Court's *Benson* quote, the above dictionary definitions, or the Supreme Court's most recent decision in *Alice.* The claimed method can only be accomplished with specific apparatus and multiple physical steps (or their virtual equivalent),[5] i.e., [playing] "<u>cards</u>," which are dealt to "<u>player(s)</u> in a "player(s) versus player(s)" card game" "<u>using at least one device or using a table</u>."

---

[4] See also, *In Re Fisher,* 421 F.2d 1365, 1378 (Fed. Cir.), citing S. Rep. No. 82-1979, at 7 (1952), U.S. Code Cong. & Admin. News at 2394, 2399, for the proposition that "'anything under the sun that is made by man' constitutes patentable subject matter for a patent" under §101, subject only to the statutory requirements of being new, useful, nonobvious, adequately described and taught, and disclosing of its best mode.

[5] See footnote 2.

(Claim 1, A023).  Although the specified "physical steps" of dealing cards and conducting wagering rounds in specific directions can be replicated in a virtual environment by using electronic hardware and software, this is currently true of almost any human activity.  As extreme examples, even war or sex can now be replicated in virtual worlds.  However, even if the claimed steps of the Webb application are conducted by avatars or holograms,  such steps are inconsistent with the ordinary, contemporary, common meaning of "abstract" ideas.  On the contrary, the claimed methods of play are "practical," "limited to a particular object," and are not addressed to "theoretical conditions only."  See Webster's above.

Claim 1, for example, defines a method of playing a player(s) versus player(s) card game wherein a button player is established among a plurality of players, and cards are dealt beginning with a starting player positioned relative to the button player, where the starting player is a player still in the hand sitting in a next clockwise sequence of the button player.[6]  Multiple rounds of wagering are then conducted in various directions among the players, and the hand is subsequently completed according to game rules.  These words do not describe an abstraction in any recognized sense of the word; but a very specific application of an idea, just as in *Diehr,* 450 U.S. at 187-88, and *Alice*, 134 S.Ct. at 2354.

---

[6]  See full text of Claim 1 at pages 9-10, *supra.*

In *Alice*, the Court explained that "At some level, all inventions … embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract idea." *Alice,* 134 S.Ct. at 2354; citing *Prometheus*, 132 S.Ct. at 1293. "Thus, an invention is not rendered ineligible for patent simply because it involves an abstract concept." *Alice,* 134 S.Ct. at 2354, citing *Diehr*, 450 U.S. at 187.

**"'[A]pplication[s]' of such concepts "'to a new and useful end'" … remain eligible for patent protection**. *Alice*, 134 S.Ct at 2354, citing *Benson*, 409 U.S. at 67, emphasis added. "Accordingly" the *Alice* Court said "in applying the § 101 exception," we must distinguish between patents that claim the " 'buildin[g] block[s]' " of human ingenuity and those that integrate the building blocks into something more [cite omitted] thereby transforming them into a patent-eligible invention." *Id*. Further citing *Prometheus*, 132 S.Ct. at 1296-97, the Court "set forth a framework for distinguishing" patent-eligible claims from those that are ineligible:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts…. If so, we then ask, "[w]hat else is in the claims before us"…. To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application…. We have described step two of this analysis as a search for an "'inventive concept'" – *i.e.*, an element or combination of

elements that is "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."

*Alice*, 134 S.Ct. at 2355.

Applying this language to the present claims, it can be acknowledged that Appellant's claimed invention, like "all inventions" "at some level" "rest upon, or apply … abstract ideas."  The abstract idea in this case proceeds from the observation that the second, third or last person or entity in a group that is permitted or required to take any sequential action has the opportunity to observe and be guided by the actions of those who precede him or her, an advantage not enjoyed by the first person allowed or required to take the action and not fully enjoyed by all other persons prior to the last to take action.

This observation then leads to the further conclusion that changing the order of permitted or required actions alters the advantage that is fully enjoyed by the last person and partially enjoyed by all others after the first.  This conclusion (arguably an abstract idea) is at the foundation of the present invention.  It is not, however, the invention.

The invention lies in applying the benefit of these arguably abstract ideas in a very specific context, the series of wagers permitted or required in a card game of the type played in gambling casinos and, more specifically, certain poker games, particularly community card games that employ a "button" to designate the lead or

21

final bettor in a wagering round.  These card games conventionally permit betting in only one direction per hand of play.  Reversing the direction of the betting rounds within a hand of play is new, novel and useful, as determined by the PTO in withdrawing all other rejections, including a prior rejection based on obviousness, thus recognizing that Webb's invention was neither anticipated nor rendered obvious by anything in the prior art of casino gaming or card games generally.

Nevertheless, the PTO Examiner found, and the PTO Board affirmed, that despite its novelty and usefulness, the present invention was not patent-worthy because it attempted to monopolize an abstract idea.  This is wrong because Appellant does not claim the abstract idea of changing the order of sequential actions by different persons or entities in any context but one--the betting rounds of multi-hand card games in which certain defined steps take place.

Shortly after the Supreme Court's *Alice* decision, the Commissioner of the PTO issued a memo to the PTO's Patent Examining Corps entitled "Preliminary Examination Instructions in view of the Supreme Court Decision in Alice Corporation Pty. Ltd. v. CLD Bank International, et al." ("Post-*Alice* Preliminary Instructions").  See A193-196.  The Commissioner first observed that, contrary to the PTO's pre-*Alice* practice, that *Alice* made clear that the same analysis should be applied to each of the three judicial exceptions to patentability and, more specifically, that the analysis of claims purportedly containing or built upon

abstract ideas should be the same as that applied by the PTO to claims that include

or are built upon laws of nature.  A194.  The Commissioner further determined that

*Alice* also dictated use of the same analysis for both product and process claims,

contrary to the PTO's prior *Bilski* guidance.  *Id.*  See Manual of Patent Examining

Procedure ("MPEP") 2106(II)(A).  The PTO's post-Alice Preliminary Instructions

specifically supersede MPEP 2106(II)(A) and 2106(II)(B).  The PTO's Post-*Alice*

Preliminary Instructions dissect *Alice's* two-part analysis as follows:

**Part 1:**  Determine whether the claim is directed to an abstract idea.

As emphasized in *Alice Corp*., … "at some level, all inventions embody, use, reflect rest upon or apply abstract ideas and the other exceptions.  Thus, an invention is not rendered ineligible simply because it involves an abstract concept.  In fact, inventions that integrate the building blocks of human ingenuity into something more by applying the abstract idea in a meaningful way are eligible.

Examples of abstract ideas referenced in *Alice Corp.* include:

- Fundamental economic practices
- Certain methods of organizing human activities
- "[A]n idea of itself,[7] and
- Mathematical relationships/formulas

*        *        *

**Part 2:**  If an abstract idea is present in the claim, determine whether any

---

[7] "[A]n idea of itself," is explained by a cite to *Alice*, slip op. at 7-8:  "*e.g*., a principle, an originating cause, a motive (citing *Benson*, 409 U.S. at 67).

element, or combination of elements in the claim is sufficient to ensure that the claim amounts to **significantly more** than the abstract idea itself.  In other words, are there are limitations in the claim that show a patent-eligible application of the abstract idea, *e.g*., more than a mere instruction to apply the abstract idea?  Consider the claim as a whole by considering all claim elements, both individually and in combination.

Limitations referenced in *Alice Corp.* that may be enough to qualify as "significantly more" **when recited in a claim with an abstract idea** include, as non-limiting or non-exclusive examples:

- Improvements to another technology or technical field;

- Improvements to the functioning of the computer itself;

- Meaningful limitations beyond generally linking the use of an abstract idea to a particular technological environment.

Limitations referenced in *Alice Corp.* that are not enough to qualify as "significantly more" **when received in a claim with an abstract idea** include, as non-limiting or non-exclusive examples:

- Adding the words "apply it" (or an equivalent) with an abstract idea, or mere instructions to implement an abstract idea on a computer;

- Requiring no more than a generic computer to perform generic computer functions that are well-understood, routine and conventional activities previously known to the industry.

A194-195, emphasis in original.

The PTO'S Post-*Alice* Preliminary Instructions reinforce the point that the mere presence of an abstract idea is not dispositive; the key is what is done with that idea.  Here, the admittedly abstract idea, that a person or entity acting later in a

set of sequential actions has the advantage of being able to observe and be guided by the actions of those preceding him/her, has been taken several steps further. The next step is the conclusion (perhaps also an abstract idea) that altering the sequential order alters the positional advantage and that such advantage can be neutralized by certain alterations or reversals in the sequential actions. The final step is the application of the above ideas to a very specific context, wagering in a poker-style card game suitable for commercial casino play in order to achieve greater fairness and thereby maximize both wagers and casino revenue.

It is submitted that the specificity and context added by Appellant's claims is as meaningful as the application of a mathematical formula to a rubber molding process in *Diehr* (450 U.S. at 177-178), the application of a mathematical formula for computing alarm limits in a catalytic conversion process (see *Parker v. Flook*, 437 U.S. 584, 594-595 (1978), the application of certain computer generated steps to internet advertising and sales in *Ultramercial* [*v. Hulu*, 657 F.3d 1323, 1329 (Fed.Cir. 2011)]*,* or the board game, party game, or card play of the PTO Board decisions discussed below.

In *Ex parte Futrell*, Appeal No. 2012-000740, 2014 WL 3950414 (PTAB Aug. 11, 2014), the applicant claimed a method for playing a game comprising a described game board, script money, occupation cards, and "a pad of paper sheets, a plurality of player's indicator pieces [and] a randomizer for indicating the

number of spaces to be moved by a player, determining the order of play [and] assigning a predetermined amount of script money to each player at the beginning of each level of play." *Futrell*, at *1.

The *Futrell* Examiner found the claimed steps to be merely "abstract ideas" because they were simply "rules that may be applied for moving game pieces on a game surface selected from an infinite variety of possible hypothetical ways game pieces may move." The Examiner reasoned that '[in] playing a board game there is no concrete (repeatable) result or tangible (real world) result" and that the claimed method, "while perhaps reciting a number of physical steps, is [merely an attempt to claim a set of abstract ideas/rules for playing a board game." *Id*. at *24.

The *Futrell* Board disagreed, stating: "a game board [had] at least two paths, occupation cards, a pad of paper, and player indicator pieces," that were required "in order for the claimed method to be performed." It was therefore a patent-eligible "process" under § 101. *Id*., at *3.

*Ex parte Griffith*, App. No. 2011-013727, 2013 WL 5956217 (PTAB Nov. 7, 2013), is similarly instructive. In *Griffith*, the claims were directed to "a global property trading game" that included a "substantially planar game board" having a "pattern thereon," defining a "continuation path" "divided into a plurality of stations." The game also involved business cards, dice, and color coded game pieces. The game play involved moving the game pieces to the stations and

purchasing non-owned assets by surrendering business cards.  The Board, citing

*Bilski's* admonition that "Congress plainly contemplated that the patent laws would

be given wide scope" (*Bilski*, 130 S.Ct., at 3225, citing *Chakrabarty*, 447 U.S., at

308), found the *Griffith* claims patent eligible, noting that "[t]he claims at issue

require a specific apparatus … in order to be performed."  *Id*. at *34.

A similar result was reached in *Ex parte Hamer*, App. No. 2011-013191,

2013 WL 6217820 (PTAB Nov. 18, 2013).  Rather than a board game, the "party

game" *in Hamer* only required "a flexible straw" and "semi-solid flavored

material" such as "jellied drinks, granitas, and slushes."  The game only required

that "one of said two people sucks and the other … blows" to "move the flavored

material from the straw into the mouth of said one of said two people."  The

Examiner, citing *Bilski*, found "an insufficient recitation of a machine or a

transformation."  The Board first disposed of the Examiner's application of the

"machine-or-transformation test," stating:

> [T]he rejection does not address the particularity or generality of the
> recited flexible straw or semi-solid flavored material.  The rejection also
> does not address whether the use of the recited flexible straw or semi-solid
> flavored material contributes only nominally or insignificantly to the
> execution of the claimed method, or instead imposes meaningful limits on
> the execution of the claimed process….  The claimed steps do not appear
> capable of being carried out by a human alone; rather, the claimed steps are
> tied to the flexible straw and semi-solid flavored material.

*Id*. at *1.  The Board then proceeded to address the Examiner's handling of the "abstract idea" exception, i.e., the Examiner's determination that:

> [T]he claims are mere statements of a general concept of  human behavior," such as "a human following rules or instructions for playing a game."  The involvement of a general concept (such as a principle, theory, plan, or scheme) in executing the steps of a method can be another clue that a claim is drawn to an abstract idea."

*Id*. at *2.  The Board, however, disagreed, stating:

> [T]he rejection does not address the relevant factors where a general concept is present in a patent claim….  For example, the rejection does not address the extent to which the concept's use would be preempted in other fields, the extent to which the claim is so abstract that it would cover both known and unknown uses of the concept, whether the concept is disembodied or instantiated, or whether the performance of the process is observable and verifiable versus subjective and imperceptible….  Without more, it is unclear, for example, how the claimed steps would preempt the use of the concept in other fields.

*Id*.

The Board's reasoning in *Hamer* is directly applicable to the instant case. Appellant's claims require "dealing cards," using a "device or a table," to players who are engaged in multiple rounds of wagering, the order of which is altered per

the steps of the claimed process.  The apparatus of *Hamer* was no more substantive than that claimed in the Webb Application.  Nor is the concept of "sucking" and "blowing" any more sophisticated than the reversal of bettor direction in the instant claims.  Nor is the instant method any more general in application than Hamer's blowing/sucking party game.  It is obviously less so.

Perhaps even more instructive than *Hamer* is the Board's decision in *Ex parte Loewenstein*, App. No. 2011-013688, 2014 WL 1154021 (PTAB).  In *Loewenstein*, claims 1 and 14 recited:

1.    A gaming apparatus for displaying cards from one or more decks of cards, where each deck of cards has four suits, each suit has thirteen ranks, every card of each deck has a unique combination of one of the four suits and one of the thirteen ranks, and where the cards are displaying in one of three states:

(a)    a first state showing only the rank associated with the card,

(b)    a second state showing only the suit associated with the card, or

(c)    a third state showing both the rank associated with the card and the suit associated with the card, where the third state of every card always shows the same rank displayed in the first state (a) or the same suit displayed in the second state (b);

Each card is in either the first state or second state when initially displayed in the card game; and

The state of each card transforms from the first state or the second state to the third state in response to one or more actions by a player of a card game on the gaming apparatus.

14.    A method to play a poker game where cards are dealt from a

plurality of playing cards having four suits, where each suit has thirteen ranks, where each card has one of the four suits and one of the thirteen ranks, the method comprising:

  (A)    displaying each card in one of three states:

      (i)    a first state where only the suit associated with the card is displayed;

      (ii)    a second state where only the rank associated with card is displayed or; or

      (iii)    a third state where both the suit from (A)(i) and rank from (A)(ii) are displayed,

  (B)    dealing cards to a player in a diamond pattern, each of the four sides of the diamond forming a five card poker hand with three interior cards and two corner cards wherein the dealt cards are initially displayed in the first or second state;

  (C)    the player exchanging cards between hands;

  (D)    after the exchanges, the display of the cards transforming into the third state;

  (E)    comparing each hand to a paytable; and

  (F)    rewarding the player according to the paytable.

The Examiner in *Lowenstein* concluded that the claims were directed to a non-statutory abstract idea. In particular, the Examiner determined that the claims included "insufficient recitation of a machine or transformation," were "a mere statement of a general concept" and that the additional limitations recited in the dependent claims merely involved insignificant extra-solution activity or were intangibly related to the performance of the steps.

The Board's reversal is directly applicable to the instant case:

> Claims 14 and 20 recite methods of playing a poker game whereby cards are dealt from a "plurality of playing cards having four suits, where each suit has thirteen ranks, where each card has one of the four suits and one of the thirteen ranks" (claim 14) and from "a deck of playing cards, the deck having four suits, each suit having thirteen ranks, each card of the deck is associated with one of the four suits and one of the thirteen ranks" (claim 20). The cards are displayed, dealt, exchanged, further displayed, and compared (claim 14) or displayed, received, and further displayed (claim 20). While there are various options as to what types of cards can satisfy the recitations of the claims, the options are not unlimited.

> Further, the claims either require the use of the physical embodiment of the cards or the use of a video gaming machine to perform the steps of the recited claims. Accordingly, although there may be more than one option for the "particular" machine required to implement the claimed methods, the type of machine is not unlimited.

*Id.,* at 6. Although the *Lowenstein* claims are wordier than Appellant's, they involve less actual structure, not more. While Appellant's recitation of "cards," does not explicitly describe those cards as having "four suits" with "thirteen ranks," those details of typical playing cards are easily discernible from the Webb specification and the everyday experience of anyone who has played a game of cards, especially any poker-type game. One of ordinary skill in the art would certainly be familiar with these details.

The Board's favorable observation in *Lowenstein* that "the claims either require the use of the physical embodiment of the cards or the use of a video gaming machine to perform the steps of the recited claims" also deserves mention. As the Court will recall, the Examiner and Board in this case found the interchangeability between physical and electronic means in Appellant's claims to be fatal to the "apparatus" aspects of Appellant's arguments. Reaching the opposite conclusion, the Board in *Lowenstein* found this fact to be very important to its finding of § 101 eligibility. Note also that Appellant's claims require a "device or a table" in addition to the "cards."[8]

The portions of Section 2106 of the MPEP that were not superseded by *Alice* are also instructive, even though they employ a slightly different rubric then *Alice* and the PTO's post-*Alice* Preliminary Instructions. MPEP § 2106 explains that:

> While abstract ideas, physical phenomena, and laws of nature are not

---

[8] This Court's non-precedential August 26 decision in *Planet Bingo, LLC v. VKGS LLC*, No. 2013-1663, 2014 WL 4195188 (Fed. Cir. Aug. 26, 2014) is distinguishable for multiple reasons. The claimed invention was essentially a set of mental steps for managing a bingo game which could have just as easily been carried out by a human using pen and paper, the claimed general purpose computer being essentially a "throw-away" limitation. Exemplary claim 7, for example, merely recites steps of selecting, storing, and retrieving two sets of numbers, assigning a player identifier and a control number, and then comparing a winning set of bingo numbers with a selected set of bingo numbers, a concept very similar to the "risk hedging" of *Bilski* and "mitigating settlement risk" in *Alice*. Here, the initial abstract concepts have been "transformed" into steps requiring the "dealing" of "cards," using "at least one device or using a table," and physically changing the direction of betting by the players.

eligible for patenting, methods and products employing abstract ideas, physical phenomena, and laws of nature to perform a real-world function may well be.

* * *

The claimed subject matter must not be wholly directed to a judicially recognized exception. If it is, the claim is not eligible for patent protection and should be rejected under 35 U.S.C. §101…. However, a claim that is limited to a particular practical application of a judicially recognized exception is eligible for patent protection. A "practical application" relates to how a judicially recognized exception is applied in a real world product or a process, and not merely to the result achieved by the invention. When subject matter has been reduced to a particular practical application having a real world use, the claimed practical application is evidence that the subject matter is not abstract (*e.g.*, not purely mental) and does not encompass substantially all uses (preemption) of a law of nature or a physical phenomenon. See, *e.g.*, *Ultramercial v. Hulu*, 657 F.3d 1323, 1329 (Fed. Cir. 2011) (stating that the patent "does not claim a mathematical algorithm, a series of purely mental steps, or any similarly abstract concept. It claims a particular method . . . a practical application of the general concept.").

See also, *In re Fisher*, 421 F.3d at 1379, citing MPEP § 2107 for essentially the same points. Here, the claimed subject matter is a very specific playing methodology for a specific type of card game that is suitable for play in real world (including electronic) casinos by real players for real wagers.

33

The claims of the Webb application define a very specific method of conducting a player(s) versus player(s) card game.  As explained in the specification, the variation in wagering directions during the course of play eliminates positional advantage, which would be more desirable to many players and, in the real word, would attract more players, thereby generating more wagers and more revenue.  The claimed invention as a whole is thus both useful and accomplishes a practical application.  The claims of the Webb Application describe a very specific, very concrete, very practical game procedure "not [merely] an idea or concept, or … simply a starting point for future investigation or research."  See *Brenner v Manson,* 383 U.S. 519, 528-36 (1966).

## VI.    Conclusion and statement of relief sought

Appellant respectfully submits that the claims of the present invention satisfy the requirements of § 101, particularly as regards the "abstract idea" exception, as explained by the Supreme Court in *Bilski, Alice*, and its earlier precedents, as well as this court's recent decisions, notably *Ultramercial*, and the recent decisions of the PTO Board addressing patent claims that are very analogous to the claims presented by this appeal.

For these reasons, it is respectfully submitted that the Board's Decision is legally erroneous and, for that reason, it must be reversed.  Each of Appellant's claims should be held patent eligible under 35 U.S.C. § 101.


September 22, 2014                              Respectfully submitted,


                                               /s/ *Robert A. Rowan*
                                               Robert A. Rowan
                                               rar@nixonvan.com
                                               Alan M. Kagen
                                               amk@nixonvan.com
                                               Michael E. Crawford
                                               mec@nixonvan.com
                                               Nixon & VANDERHYE P.C.
                                               901 North Glebe Road
                                               Arlington, Va. 22203-1808
                                               Tel.:   703-816-4000
                                               Fax:    703-816-4100

                                               *Counsel for Appellant,* Derek J. Webb

# Addendum

Decision on Appeal, April 1, 2014 ....................................................................... A-1

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

*Ex parte* DEREK J. WEBB

————————————

Appeal 2012-001567
Application 12/429,724
Technology Center 3700

————————————

Before: JENNIFER D. BAHR, JOHN C. KERINS, and
JILL D. HILL, *Administrative Patent Judges*.

BAHR, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2012-001567
Application 12/429,724

## STATEMENT OF THE CASE

Derek J. Webb (Appellant) appeals under 35 U.S.C. § 134 from the
Examiner's decision rejecting claims 1-15. We have jurisdiction under
35 U.S.C. § 6(b). An oral hearing in accordance with 37 C.F.R. § 41.47 was
held on February 11, 2014.

We AFFIRM.

### *The Claimed Subject Matter*

Claim 7, reproduced below, is illustrative of the claimed subject
matter.

> 7.     A method of playing a player(s) versus player(s) card
> game with a plurality of players, the method comprising dealing
> hands of cards to the players one card at a time using at least
> one device or using a table; conducting multiple rounds of
> wagering among the players in a first direction; conducting a
> last round of wagering among the players in a second direction
> opposite from the first direction; and resolving the card game
> and wagers only after completing all rounds of wagering,
> wherein the first direction is pre-established prior to conducting
> the initial round of wagering.

### *Evidence*

The Examiner relied on the following evidence in rejecting the claims
on appeal:

Skratulia                    US 5,607,161              Mar. 4, 1997

Victor H. Royer, *How to Play Casino Poker – Texas Hold-Em* available at
http://www.vegas.com/vegascom/betbac/holdem.html (last visited Jul. 11,
1996).

John Scarne, *Scarne's Encyclopedia of Games*, pp.14, 26 (Harper & Row
1983) (1973).

Appeal 2012-001567
Application 12/429,724

## Rejections

Claims 1-15 stand rejected under 35 U.S.C. § 101 as being directed to patent-ineligible subject matter.

Claims 1-3, 5-11, and 13-15 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Royer and Skratulia.

Claims 4 and 12 stand rejected under 35 U.S.C. § 103(a) as being unpatentable over Royer, Skratulia, and Scarne.

## OPINION

### Rejection under 35 U.S.C. § 101

Appellant groups claims 1-15 together in contesting this rejection. Thus, we select claim 7 to decide the appeal of this rejection, with claims 1-6 and 8-15 standing or falling with claim 7.  37 C.F.R. § 41.37(c)(1)(vii) (2011).

The Examiner determined that claim 7 is not directed to patent-eligible subject matter under 35 U.S.C. § 101, because it "requires no machine implementation, requires no transformation of a particular article and is seen as an **attempt to receive patent protection for an abstract idea in the form of a new set of rules**."  Ans. 8.  The Examiner analyzed several factors weighing toward or against patent eligibility and determined that "the factors in this case weighing against patent eligibility **far outweigh** the factors weighing toward patent eligibility."  Ans. 9 (citing Interim Guidance for Determining Subject Matter Eligibility for Process Claims in View of Bilski v. Kappos, 75 Fed. Reg. 43,922, 43,925-26 (Jul. 27, 2010)).

Appellant argues that none of the factors weighing against patentability applies to Appellant's invention, which, according to

3

Appeal 2012-001567
Application 12/429,724

Appellant, "is fully 'embodied' and can only be performed with a specified apparatus (playing cards) and 'actual physical steps.'" App. Br. 18. Appellant additionally argues that "Appellant's invention clearly 'implements a concept in a tangible way [and] the performance of [the claimed] steps is observable and verifiable.'" *Id.* Appellant adds that "without being 'observable and verifiable,' the claimed 'method of playing a player(s) versus player(s) card game,' would fail both in actual practice and in obtaining regulatory approval if required in any U.S. jurisdiction allowing commercial poker games." *Id.*

Appellant asserts that "[t]here is nothing 'abstract' . . . in the subject matter of the present invention," because the claimed method "can only be accomplished with a specific apparatus, playing cards," and is "defined around a very specific set of 'physical steps' of dealing cards and conducting wagering rounds in specified directions." App. Br. 21. According to Appellant, "[i]f an 'idea' is being claimed, it is not an abstraction in any sense of the word; but a very specific application of an idea." App. Br. 22. Appellant urges that "the claimed subject matter is a very specific playing methodology for a card game that is designed to be played for real money. Poker rooms in casinos, for example, are operated with the expectation of making very real profits for the casino, including the casino's shareholders or private owners." App. Br. 23.

Appellant contends that the Examiner has "erroneously applied" the machine-or-transformation test, which, according to Appellant, does not require that the steps be performed by a machine, rather than by a human being. Reply Br. 3. Additionally, Appellant asserts that "[t]he claimed

Appeal 2012-001567
Application 12/429,724

cards and players are all integral apparatus and must exist physically or be 'tied to' specific machine components." *Id.*

According to Supreme Court precedents, "the machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101," but "is not the sole test for deciding whether an invention is a patent-eligible 'process.'" *Bilski v. Kappos*, 130 S.Ct. 3218, 3227 (2010). Thus, the Examiner correctly considered this test in determining whether claim 7 is directed to patent-eligible subject matter.

We do not agree with Appellant that the Examiner erroneously applied the machine-or-transformation test. The machine-or-transformation test asks whether the claim "requires a particular machine implementing a process or a particular transformation of matter." *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1347 (Fed. Cir. 2013). Appellant makes no assertion that claim 7 requires a particular transformation of matter. Rather, Appellant asserts that "[t]he claimed cards and players are all integral apparatus and must exist physically or be 'tied to' specific machine components." Reply Br. 3. Thus, we focus our attention on the question of whether claim 7 requires a particular machine implementing a process.

We reject Appellant's contention that players can reasonably be considered apparatus or machine components forming an integral apparatus with the cards. Moreover, the Examiner correctly found that claim 7 is not limited to physical cards. Indeed, Appellant's invention is not limited to any particular form or media, but, rather, encompasses an unlimited variety of forms and media, both known and unknown. In particular, Appellant's Specification states that

5

Appeal 2012-001567
Application 12/429,724

> the embodiments described above can be
> embodied in a wide variety of forms and media
> including, *but not limited to*, single player slot
> video machines, multi-player slot video machines,
> electronic games and devices, lottery terminals,
> scratch-card formats, software as well as in-flight
> home and internet entertainment. *In addition*, the
> described embodiments *can also* be readily
> implemented as a computer program product (e.g.,
> floppy disks, compact disks, etc.) comprising a
> computer readable medium having control logic
> recorded therein to implement the features of the
> invention as described in relation to the other
> preferred embodiments.

Spec. 8, para. [0026] (emphasis added).

This point also was conceded by Appellant's representative at the oral hearing. *See* Oral Hearing Transcript 7-9. Furthermore, in any event, even if the cards were considered to be a specific machine or apparatus, the cards do not implement any process. Claim 7 mentions cards only in the context of the step of "dealing hands of cards to the players one card at a time using at least one device or using a table." This claimed step requires nothing more than that the cards be dealt, i.e., given or provided, to players. Further, the limitation "using at least one device or using a table" is not sufficient to tie the claimed method to a particular machine. The nominal reference to a generic "device" in the phrase "using at least one device" fails to limit the device to any particular device (i.e., machine). Similarly, the nominal mention of "using" either a device or a table does not tie the device or table to the "dealing" step in any meaningful way.

A claim is not patent-eligible if it is to an abstract idea itself, rather than to an application of an abstract idea. *Ultramercial*, 722 F.3d at 1343 (citing *Bilski*, 130 S.Ct. at 3230).

6

Appeal 2012-001567
Application 12/429,724

Appellant's arguments do not persuade us that the Examiner erred in determining that claim 7 is directed to an abstract idea, and not to the application of an abstract idea.  As noted above, Appellant's claimed method is not "embodied" in any particular, tangible, or concrete form, nor limited to performance by a specific apparatus, but, rather, encompasses an unlimited variety of forms and media.  Even accepting Appellant's argument that the performance of the steps in the claimed method is observable and verifiable, this does not weigh substantially, if at all, against abstractness. Indeed, the performance of the steps of the method claimed in *Bilski* held by the Supreme Court to be an abstract idea is no less observable and verifiable than the steps of claim 7 before us in this appeal." *See Bilski*, 130 S. Ct. at 3223, 3231."  Appellant's assertions with respect to regulatory approval and expectation of real profits by owners and shareholders of poker rooms and casinos are not commensurate with the scope of claim 7, which is not limited to a casino or commercial poker game and does not require regulatory approval.  Moreover, claim 7 does not specify the subject matter of the wagering, nor require that the claimed method be performed or played for real money.  In any event, the risk of losing or potential for winning or making real money or real profit does not strike us as a particularly strong factor weighing against abstractness and in favor of patentability.  Indeed, managing the risk of loss of real money and the potential for making profit clearly is the incentive for practicing the method held by the Supreme Court to be patent-ineligible in *Bilski*, 130 S.Ct. at 3223, 3231.

Claim 7 is directed to the concept of varying wagering positions or directions in a card game to eliminate positional advantage.  The preamble limitation of "playing a player(s) versus player(s) card game with a plurality

Appeal 2012-001567
Application 12/429,724

of players" does not meaningfully limit the concept, as player(s) versus player(s) competition is implicit in the concept of positional advantage in wagering position or direction. *See Ultramercial*, 722 F.3d at 1348 ("If, to implement the abstract concept, one must perform the additional step, or the step is a routine and conventional aspect of the abstract idea, then the step merely separately restates an element of the abstract idea, and thus does not further limit the abstract concept to a practical application."). Alternatively, this preamble limitation simply refers to the relevant and pre-existing audience, namely players of player(s) versus player(s) card games, which existed long before the filing of the present application. *See Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 132 S.Ct. 1289, 1297 (2012) (holding that a limitation that simply refers to a relevant audience that existed long before anyone asserted the patent claim was ineffective to render the claim patent-eligible). At most, this language limits the claim to the use of the idea of varying wagering positions to one very broad field of use (player(s) versus player(s) card games). The Supreme Court found a similar, and in fact even narrower, field of use limitation did not make the concept patentable. *Bilski*, 130 S.Ct. at 3231 (stating that "limiting an abstract idea to one field of use or adding token postsolution components did not make the concept patentable" and holding claims attempting "to patent the use of the abstract idea of hedging risk in the energy market and then instruct the use of well-known random analysis techniques to help establish some of the inputs into the equations" to be patent-ineligible). The steps of dealing cards and resolving the card game do not render the claimed method patentable, as these are necessary and conventional steps to playing a card game (i.e., conventional pre-solution and post-solution activity). *See Parker*

Appeal 2012-001567
Application 12/429,724

*v. Flook*, 437 U.S. 584, 590 ("The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance."); *cf. Mayo*, 132 S.Ct. at 1298 ("Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law"). Likewise, the step of conducting multiple rounds of wagering in a first direction is nothing more than conventional pre-solution activity. Finally, the step of conducting a last round of wagering in a second direction opposite from the first direction is required to implement the concept of varying wagering position or direction to eliminate positional advantage, or a restatement of an element of the idea.[1]

For the above reasons, Appellant does not apprise us of error in the Examiner's determination that claim 7 is not directed to patent-eligible subject matter under 35 U.S.C. § 101, because it requires no machine implementation, requires no transformation of a particular article, and is to an abstract idea. We thus sustain the rejection of claim 7 and of claims 1-6 and 8-15, which fall with claim 7, under 35 U.S.C. § 101.

---

[1] In asserting that the claimed invention is "a very specific application of an idea," Appellant also points to the step of establishing a button player in reference to claim 1. App. Br. 22. This point is not pertinent to claim 7, which does not require establishment of a button player. Nevertheless, in any event, the step of establishing a button player is nothing more than establishing a reference point for dealing cards and starting the wagering, which are necessary and conventional pre-solution steps to the method, and thus would not render the claim patent-eligible.

Appeal 2012-001567
Application 12/429,724

*Rejections under 35 U.S.C. § 103(a)*

The Examiner's rejections of claims 1-15 under 35 U.S.C. § 103(a) are grounded in part on the Examiner's finding that "Skratulia teaches that it is known in the poker game art to reverse the wagering direction (clockwise or counter-clockwise) after each wagering sequence in poker." Ans. 10 (citing Skratulia, col. 4, ll. 20-53); *see also* Ans. 14 (stating, "The Examiner take[s] the position that [by] recitation of 'Direction of sequential' play, Skratulia is referring to the wagering direction or wagering sequence for each round conducted during play of Skratulia's card game."). Based on this finding, the Examiner determined it would have been obvious "to modify the game of Texas Holde-em by alternating the direction of the rounds of wagering relative [to] the player having the player button" to mitigate position advantage. Ans. 10 (citing Skratulia, col. 4, ll. 49-51). Based on this same finding, the Examiner also determined it would have been obvious "to implement the wagering technique taught by Skratulia to the Omaha poker game [taught by Scarne] in order to mitigate the positional advantage during each hand." Ans. 11 (citing Skratulia, col. 4, ll. 49-51).

We agree with Appellant that the Examiner erred in finding that Skratulia teaches reversing the wagering direction after each wagering sequence. *See* App. Br. 24-25; Reply Br. 4-5. Skratulia discloses determining the "direction of sequential play (prior to step **38** of FIG. 1), generally designated as **37**" based on whether the total numeric value of the three special dice is odd or even. Col. 4, ll. 36-46. The "direction of sequential play" alluded to by Skratulia is "the direction of sequential play of step **38** of FIG. 1." Col. 4, ll. 42-45. In step **38**, the bank hand "sequentially compares hands and settles wagers" with the other players.

10

Appeal 2012-001567
Application 12/429,724

Col. 3, ll. 58-60.  The players do not wager during the sequential play of step
**38**.  Rather, all wagering takes place in step **28** prior to the rolling of the
three special dice in step **32**.  Col. 3, ll. 16-17, 52-53; fig. 1.

We do not sustain the Examiner's rejections of claims 1-15 under
35 U.S.C. § 103(a), because they are based on an erroneous finding by the
Examiner.


DECISION

The Examiner's decision rejecting claims 1-15 under 35 U.S.C. § 101
is affirmed, and the Examiner's decision rejecting claims 1-15 under
35 U.S.C. § 103(a) is reversed.

No time period for taking any subsequent action in connection with
this appeal may be extended under 37 C.F.R. § 1.136(a).  *See* 37 C.F.R.
§ 1.136(a)(1)(iv).

AFFIRMED


Klh


11

# Certificate of service

I, Michael E. Crawford, being duly sworn according to law and over the age of 18, upon my oath depose and state that:

1.      I have electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel for Appellee registered as CM/ECF users:

> Nathan K. Kelley – Solicitor
> Nathan.kelley@uspto.gov
> UNITED STATES PATENT AND TRADEMARK OFFICE
> Office of the Solicitor
> Mail Stop 8, P.O. Box 1450
> Alexandria, Virginia 22313-1450
>
> *Counsel for Appellee*

2.      Upon acceptance by the Court of the above e-filed document, six paper copies will be filed with the Court, via FEDERAL EXPRESS and within the time provided in the Court's rules, by BYRON S. ADAMS who has been retained to print this document.


September 22, 2014                    */s/ Michael E. Crawford*
                                      Michael E. Crawford
                                      mec@nixonvan.com
                                      NIXON & VANDERHYE P.C.

# Certificate of compliance

a.      This brief complies with the type-volume limitation of FED.R.APP.P. 32(a)(7)(B) because the brief contains 7,947 words, excluding the parts of the brief exempted by FED.R.APP.P. 32(a)(7)(B)(iii).

b.      This brief complies with the typeface requirements of FED.R.APP.P. 32(a)(5) and the type style requirements of FED.R.APP.P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using MS Word 2003 in a 14 point Times New Roman font.

September 22, 2014                    */s/ Michael E. Crawford*
                                     Michael E. Crawford
                                     mec@nixonvan.com
                                     NIXON & VANDERHYE P.C.

                                     *Counsel for Appellants*